## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ST. CHARLES–GUILLOT**                                     **CIVIL ACTION**
**INVESTMENT, LLC, ET AL.**

**VERSUS**                                                        **NO. 23-30**

**ONE SOURCE ROOFING, INC., ET AL.**            **SECTION "O"**

## ORDER AND REASONS

Before the Court in this Hurricane Ida property-damage case removed from state court based on diversity jurisdiction is Defendant GAF Materials, LLC's motion[1] for summary judgment dismissing the Louisiana-law negligence claim that Plaintiffs St. Charles–Guillot Investment, LLC and Luling Living Center, LLC (together, "Luling") assert against it. That claim stems from losses Luling suffered after Hurricane Ida's winds pulled off the GAF-manufactured roof that One Source Roofing, Inc. installed on a nursing home Luling owned and operated. Luling's theory is that GAF assumed—and breached—a duty to inspect the roof and warn Luling of defects in One Source's installation of it. Chiefly at issue is whether GAF—a roofing manufacturer that did not supervise the roof's installation—affirmatively undertook that inspection duty by sending a representative to conduct a surface inspection of the installed roof for GAF's benefit and for the limited purpose of deciding if GAF would issue a leak-proof guarantee. GAF says the answer is "no." It thus moves for summary judgment on the grounds it did not undertake any duty that it breached. Luling rejoins that fact disputes preclude summary judgment on duty and breach.

---

[1] ECF No. 145.

GAF has the better argument on this record under the Court's reading of Louisiana law. The Court has not located, and the parties have not cited, Louisiana authority imposing a duty like the one Luling proposes—a duty on the part of a product manufacturer to conduct a beyond-surface-level inspection of a contractor's installation of the manufacturer's product to ensure the installation was done in conformity with the manufacturer's specifications. This is a diversity case, and "[a]s an *Erie* court[,] . . . it is not [the Court's] job to lay down broad new rules of state law." *Harmon v. Grande Tire Co.*, 821 F.2d 252, 259 (5th Cir. 1987). Instead, the Court's "role in the system" is "simply to apply" Louisiana law "as it currently exists." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1217 (5th Cir. 1985). Doing so, and viewing the facts and drawing all reasonable inferences in Luling's favor, the Court holds that Luling has not pointed to evidence creating a genuine dispute as to whether GAF affirmatively undertook a duty to conduct a reasonable post-installation inspection of the nursing home's roof, for Luling's benefit and beyond the mere surface inspection contemplated by GAF's guarantee. Accordingly, for these reasons and those that follow, GAF's motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

St. Charles–Guillot Investment owns a building in Luling, Louisiana.[2] Luling Living Center operates that building as a nursing home under a lease with St. Charles–Guillot Investment.[3] GAF manufactures and sells roofing materials; it is not

---

[2] ECF No. 145-2 at ¶¶ 1–2; ECF No. 149-1 at ¶¶ 1–2.
[3] ECF No. 145-2 at ¶¶ 1–2; ECF No. 149-1 at ¶¶ 1–2.

a design professional and does not practice architecture or engineering.[4] GAF manufactured a single-ply thermoplastic polyolefin ("TPO") roof membrane that One Source Roofing installed on the nursing home.[5] Portions of the nursing home's roof were pulled off during Hurricane Ida by sustained winds of 62 or fewer miles per hour.[6] The nursing home was "destroyed" as a result.[7] Luling later sued GAF, One Source Roofing, and others involved in installing the roof.[8] The details follow.

In April 2021, about four-and-a-half months before Hurricane Ida made landfall in Louisiana, Luling contracted with One Source Roofing to install a mechanically fastened TPO roofing system on the nursing home.[9] The scope-of-work for the job explained that "the manufacturer's representative" would "inspect and certify the new roof system and will then present a NDL (no dollar limit) total system warranty to the building owner."[10] Before One Source Roofing installed the roofing system, Luling's representatives met with representatives of One Source Roofing to discuss the installation.[11] During that meeting, One Source Roofing's representatives assured Luling's representatives that the proposed TPO roofing system would "[a]bsolutely" be "sustainable for hurricanes and codes in south Louisiana."[12] GAF products were brought to the meeting, but no one from GAF attended the meeting.[13]

---

[4] ECF No. 145-12 at 12:20–24, 14:1–3.
[5] ECF No. 145-2 at ¶ 3; ECF No. 149-1 at ¶ 3.
[6] ECF No. 149-13 at 1–3; ECF No. 149-14 at 2–5.
[7] ECF No. 149-2 at 10:19.
[8] ECF No. 1-1 at 1–9.
[9] ECF No. 145-7 at 1–4.
[10] *Id.* at 3 (boldface deleted).
[11] ECF No. 145-3 at 15:5–25, 16:1–13.
[12] ECF No. 149-2 at 13:11–17.
[13] *Id.* at 7:10–19.

One Source Roofing finished installing the roof in April 2021, about four months before Hurricane Ida made landfall in Louisiana.[14] No one from GAF helped One Source Roofing install the roof.[15] GAF did not control how the installation was performed; nor did GAF instruct One Source Roofing how to install the roof.[16] There is no record evidence that supports a finding that anyone from GAF was on site during the roof's installation. The record instead reflects that no GAF representative visited the property until One Source Roofing had completed the installation and requested that GAF perform a surface inspection required for issuance of a warranty.[17]

After One Source Roofing installed the roof, GAF field-service representative Bobby Whitman inspected it.[18] Whitman's inspection was performed at the behest of One Source Roofing; consistent with custom, One Source Roofing asked GAF to do a post-installation inspection so that GAF could issue the Guarantee, which One Source Roofing could in turn give Luling.[19]  The purpose of the inspection was limited: It was done "to review the roof to see if it would be acceptable for a GAF warranty"[20]—known as GAF's "EverGuard Diamond Pledge NDL Roof Guarantee" (the "Guarantee").[21]

---

[14] ECF No. 149-2 at 14:22–25–15:1–4.
[15] ECF No. 145-4 at 14:3–4.
[16] *Id.* at 14:9–15.
[17] *Id.* at 15:1–22.
[18] ECF No. 149-9 at 1–2.
[19] ECF No. 145-13 at 17:14–16; *id.* at 20:25; *id.* at 20:25–21:2.
[20] ECF No. 149-6 at 15:13–15.
[21] ECF No. 145-11 at 1–2.

Broadly, the Guarantee gave St. Charles–Guillot Investment a 20-year warranty that GAF would "repair[ ] leaks through" certain "GAF Roofing Materials":

> GAF guarantees to you, the owner of the building described above, that GAF will provide "Edge to Edge" protection by repairing leaks through the GAF roofing membrane, liquid-applied membrane or coating, base flashing, high wall waterproofing flashing, insulation, expansion joint covers, preflashed accessories, and metal flashings used by the contractor of record that meet SMACNA standards (the "GAF Roofing Materials") resulting from a manufacturing defect, ordinary wear and tear, or workmanship in applying the GAF Roofing Materials. There is no dollar limit on covered repairs. Leaks caused by non-GAF materials, such as the roof deck or non-GAF insulation, are not covered.[22]

The Guarantee "does not cover conditions other than leaks," including "[d]amage to the roof constructed of the GAF materials due to . . . improper installation," or "[u]nusual weather conditions or natural disasters[,] including, but not limited to, winds in excess of 55 miles per hour."[23] The Guarantee states that "[a]ny inspections made by GAF are limited to a surface inspection only" and "are for GAF's sole benefit."[24] The Guarantee was not signed by any Luling representative.[25]

During his post-installation inspection of the roof, Whitman identified a hollow spot in the deck; GAF made a field-services report and "punch list" that identified the spot and directed One Source Roofing to review and repair it.[26] One Source Roofing did so.[27] GAF did not send Luling's principal, Clint Guillot, a copy of the field-services report and "punch list" because GAF's "contractual obligation is

---

[22] *Id*. at 2.
[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] ECF No. 149-9 at 1–6;
[27] ECF No. 149-7 at 6:2–9.

with the contractor of final inspection," One Source Roofing, and it is "up to the contractor" whether to provide the field-services report to the building owner.[28]

When performing a post-installation roof inspection for GAF, Whitman looks to whether the roof is "installed to the minimum requirements to achieve the warranty."[29] Whitman "check[s] the seams to make sure they're tight"; he "look[s] to see that the fasteners are installed according to what the . . . information [he is] given says"; he "look[s] at their flashing to make sure that there may be caulking or the tops of the flashing are sealed"; and he "look[s] at the perimeter and ma[kes] sure the metal is fastened according to what it should be fastened."[30] When inspecting Luling's roofing system in May 2021, however, Whitman did not "check the substrate" because he was "unable to determine what the substrate" was "fastened into."[31] And Whitman did not verify the thickness of the decking because it was covered when he arrived.[32]

GAF "always" performs a final inspection of roofs installed using GAF materials if GAF will be issuing a warranty.[33] But GAF's only "contractual obligation is with the contractor" installing GAF-manufactured materials—here, One Source Roofing.[34] GAF has no relationship with the owner before a warranty issues.[35]

---

[28] ECF No. 151-3 at 11:5–13, 18:19–22.
[29] ECF No. 145-10 at 9:25–10:1.
[30] *Id.* at 10:5–17.
[31] *Id.* at 11:8–14.
[32] *Id.* at 11:15–24.
[33] ECF No. 145-4 at 10:2–12.
[34] ECF No. 145-12 at 15:21–22.
[35] *Id.* at 16:2–5.

After Whitman's inspection, GAF issued a Guarantee for the project. Issuing the Guarantee meant that GAF concluded that One Source Roofing's work met "the acceptable minimum standard" contained in GAF's "manual or specification[s]."[36]

Luling did not expect that GAF, specifically, would have any involvement in the installation or inspection of the nursing home's roof. When Luling contracted with One Source Roofing to install the roof, Luling's principal, Clint Guillot, understood that GAF manufactured the roof.[37] But Guillot did not know that a GAF representative would be inspecting the roof after One Source Roofing installed it;[38] Guillot only knew that "[s]omebody was supposed to go inspect it."[39] Guillot "never talked to anyone from GAF," and no one from GAF made any representations to Guillot about the roof.[40] Guillot does not know about anyone from GAF helping One Source Roofing install the roof or overseeing installation of it.[41]

Luling Living Center's administrator, Michael Guillera, understood that "there would be an inspection of the roof work" on the nursing home.[42] In connection with that inspection, Guillera "expected that (i) the inspection would be conducted properly, (ii) the inspection would determine correctly whether the roofing system was properly emplaced, (iii) [Luling] would be entitled to rely on that inspection, and (iv) [Guillera] would be informed, directly or indirectly, of any deviation of good

---

[36] *Id.* at 9:21; *id.* at 10;5.
[37] ECF No. 145-3 at 17:23.
[38] *Id.* at 18:3–5.
[39] *Id.* at 18:9–10.
[40] *Id.* at 18:12–20.
[41] *Id.* at 22:24–23:1–12.
[42] ECF No. 149-5 at 2 ¶ 5.

roofing practice."[43] But Guillera did not expect that GAF, specifically, would perform the inspection: Guillera never spoke to anyone he understood to be affiliated with GAF, and Guillera had no expectation that GAF would be involved in the project.[44]

Luling's expert architect, Marcel J. Fournet, Jr., opines that "poor roofing practices and attachment failure" caused a "catastrophic failure of the GAF TPO membrane roofing."[45] Fournet says "[t]he eave/edge flashing . . . failed in multiple locations because the attachment of the flashing assembly was not sound."[46] Per Fournet, "the faulty attachment released and opened the roof membrane edge, creating a parachute or sail" that in turn "captured the high winds [and] expos[ed] the deck and subframing to forces beyond its capability."[47] As a result, Fournet opines, the roof membrane "ruptured . . . and exposed the building structure to severe damage[,] including water damage."[48] "Because of the catastrophic roof failure," Fournet reasons, the nursing home "was completely exposed to the elements,"[49] and rainwater "collected within the building," "caus[ing] damage to doors, walls, finishes[,] and furnishings[,] and render[ing] the building unfit for service."[50]

Claiming the nursing home "was destroyed"[51] during Hurricane Ida, Luling sued GAF, One Source Roofing, and others in Louisiana state court.[52] Luling

---

[43] *Id.* at ¶ 6.
[44] ECF No. 151-1 at 3:13–17.
[45] ECF No. 145-5 at 5.
[46] *Id.*
[47] *Id.*
[48] *Id.* at 6.
[49] *Id.*
[50] *Id.*
[51] ECF No. 149-2 at 10:19.
[52] ECF No. 1-1 at 1–9.

originally alleged that GAF was liable on products-liability *and* negligence theories.[53] GAF and others then removed the case based on diversity jurisdiction.[54] *See* 28 U.S.C. § 1332(a)(1). After removal, Judge Milazzo granted GAF's Rule 12(b)(6) motion to dismiss Luling's original petition, but gave Luling leave to amend.[55] Luling did so.[56]

In its operative first amended complaint, Luling alleges only a negligence claim against GAF. According to Luling, GAF was negligent in failing to warn of known hazards with the installation of its roofing materials and in failing to supervise installation of those roofing materials.[57] Luling generally alleges that GAF assumed a duty to conduct a reasonable post-installation inspection of the roof by sending employees to the property to "warn [Luling] of any defects in the installation" and to "ensure the roof was installed in a good and workmanlike manner," and that GAF breached that duty when it failed to warn Luling of the deficient installation.[58]

After various preliminaries not relevant here, Judge Milazzo denied GAF's motion to dismiss Luling's operative complaint.[59] Judge Milazzo was "unable to ascertain the extent of GAF's involvement in the installation of the roof" based on the operative complaint alone.[60] "Drawing all reasonable inferences in [Luling's] favor," however, she reasoned that "it is plausible that GAF assumed a duty and became involved in the project when it visited the property to monitor the installation."[61]

---

[53] *Id.*
[54] ECF No. 1.
[55] ECF No. 18.
[56] ECF No. 19.
[57] *Id.* at ¶¶ 24–27.
[58] *Id.* at ¶ 25.
[59] ECF No. 34.
[60] *Id.* at 6.
[61] *Id.*

Now, GAF moves for summary judgment dismissing Luling's negligence claim on the grounds that Luling cannot prove duty and breach.[62] Luling opposes.[63]

## II.  LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 926 (5th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The movant has the initial burden to show that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmovant will bear the burden of proof at trial, as Luling will here, the movant meets its initial burden by "merely point[ing] to an absence of evidence" supporting the nonmovant's claim. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). The movant "need not *negate* the elements of the nonmovant's case." *Id.* (first citing *Celotex*, 477 U.S. at 323; and then citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885–86 (1990)). Nor must the movant "set forth evidence when the nonmovant bears the burden of persuasion at trial," *Wease v. Ocwen Loan Serv., L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). If the movant "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

---

[62] ECF No. 145.
[63] ECF No. 149.

10

If the movant meets its initial summary-judgment burden, however, the burden shifts to the nonmovant to "identify specific evidence in the summary judgment record demonstrating that there is a dispute of material fact concerning the essential elements of its case for which it will bear the burden of proof at trial." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 994 F.3d 704, 708 (5th Cir. 2021) (first citing FED. R. CIV. P. 56(a) & (e); and then citing *Celotex*, 477 U.S. at 324). "Speculative theories cannot defeat a motion for summary judgment." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023) (citing *Little*, 37 F.3d at 1075). Nor may a nonmovant "defeat summary judgment with 'conclus[ory] allegations, unsupported assertions, or presentation of only a scintilla of evidence.'" *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)). "Instead, the nonmovant must go beyond the pleadings and designate specific facts that prove that a genuine [dispute] of material fact exists." *Id.* (citing *Little*, 37 F.3d at 1075). If the nonmovant "fails to meet this burden, the motion for summary judgment *must* be granted." *Little*, 37 F.3d at 1076 (emphasis added).

In reviewing the summary-judgment record, the Court draws all reasonable inferences in favor of the nonmovant. *See Vote.Org v. Callanen*, 89 F.4th 459, 469 (5th Cir. 2023) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). And the Court "resolve[s] factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

## III.  GOVERNING LAW

Because the Court's jurisdiction is based on diversity, 28 U.S.C. § 1332(a)(1), the Court applies the substantive law of the forum—Louisiana. *See Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014). The Court evaluates issues of Louisiana law by looking to decisions of the Supreme Court of Louisiana. *See Keiland Constr. L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 418 (5th Cir. 2024) (citing *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018)). If there is no on-point authority from the Supreme Court of Louisiana, the Court "may look to decisions of [Louisiana's] intermediate appellate courts, barring a reason to think the [Supreme Court of Louisiana] would decide otherwise." *Id.* (citing *Meador*, 911 F.3d at 264). In its analysis, however, the Court "may not 'expand state law beyond its presently existing boundaries.'" *Id.* (quoting *Barfield v. Madison Cnty.*, 212 F.3d 269, 272 (5th Cir. 2000)).  That is because the Court's "duty is to apply existing state law, not to create it." *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 474 (5th Cir. 2015) (citing *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 720 (5th Cir. 1995)).

## IV.  ANALYSIS

GAF moves the Court to grant summary judgment dismissing Luling's Louisiana-law negligence claim because GAF says that Luling lacks evidence sufficient to create a genuine dispute on the duty and breach elements of the claim.[64]

---

[64] ECF No. 145 at 1.

Article 2315 of the Louisiana Civil Code is "the fountainhead of tort law in Louisiana." *Pickard v. Amazon.Com, Inc.*, 2023-1596, p. 11 (La. 6/28/24); 387 So. 3d 515, 524. It provides in relevant part that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LA. CIV. CODE ANN. art. 2315(A). Applying Article 2315, "[t]he Louisiana Supreme Court has adopted a 'duty-risk' analysis for assigning tort liability under a negligence theory." *Doe v. McKesson*, 2021-929, p. 7 (La. 3/25/22); 339 So. 3d 524, 531.

Recovering under that duty-risk analysis here requires Luling to prove five elements: "(1) [Luling] suffered an injury; (2) [GAF] owed a duty of care to [Luling]; (3) the duty was breached by [GAF]; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached." *Id.* (citation omitted). As Plaintiff here, Luling "bears the burden of proof and must establish [its negligence] claim by a preponderance of the evidence." *Hebert v. Rapides Par. Police Jury*, 2006-2001, p. 7 (La. 4/11/07); 974 So. 2d 635, 642 (citing *Benjamin ex rel. Benjamin v. Hous. Auth. of New Orleans*, 2004-1058, p. 5 (La. 12/1/04); 893 So. 2d 1, 4–5). "If [Luling] fails to satisfy one of the elements of [the] duty-risk [analysis], [GAF] is not liable" for negligence. *Pitre v. La. Tech. Univ.*, 95-1466, p. 9 (La. 5/10/96); 673 So. 2d 585, 590. GAF's motion challenges only the duty and breach elements. The Court considers each element in turn.

GAF first contends that Luling lacks evidence sufficient to support the duty element of Luling's negligence claim.[65] Luling rejoins that GAF affirmatively assumed a duty to reasonably inspect the roof for Luling's benefit by sending field-services representative Whitman to the property for a post-installation inspection.[66] Viewing the facts and drawing all reasonable inferences in Luling's favor, *see Reeves*, 530 U.S. at 150, the Court holds that Luling has not pointed to evidence sufficient to create a genuine dispute on the duty element. The facts and reasonable inferences viewed in Luling's favor do not allow the Court to conclude that GAF affirmatively assumed a duty to conduct a reasonable post-installation inspection of the roof, for Luling's benefit and beyond the surface inspection contemplated by the Guarantee.

A "threshold issue" in negligence cases like this one "is whether the defendant owed the plaintiff a duty." *Posecai v. Wal-Mart Stores, Inc.*, 99-1222, p. 4 (La. 11/30/99); 752 So. 2d 762, 766 (citing *Meany v. Meany*, 94-0251, p. 6 (La. 7/5/94); 639 So. 2d 229, 233). Under Louisiana law, "[a] duty is 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Malta v. Herbert S. Hiller Corp.*, 2021-209, p. 11 (La. 10/10/21); 333 So. 3d 384, 395 (quoting *Morris v. Orleans Par. Sch. Bd.*, 553 So. 2d 427, 429 (La. 1989)).

"Whether a defendant owes a plaintiff a duty is a question of law." *Doe*, 339 So. 3d at 531. (citations omitted). But "the existence of a duty cannot be determined in the absence of a case's factual background and knowledge of what the surrounding circumstances may be." *Saldana v. Larue Trucking, LLC*, 52,589 (La. App. 2 Cir.

---

[65] ECF No. 145-1 at 9–17.
[66] ECF No. 149 at 9–23.

4/10/19); 268 So. 3d 430, 437 (citation omitted). "[T]he inquiry into whether a duty is owed is made on a case-by-case basis." *Malta*, 333 So. 3d at 936 (citing *Gresham v. Davenport*, 537 So. 2d 1144, 1147 (La. 1989)). "In deciding whether to impose a duty," courts "make a policy decision in light of the unique facts and circumstances presented." *Posecai*, 752 So. 2d at 766 (citing *Socrocro v. City of New Orleans*, 579 So. 2d 931, 938 (La. 1991)). Ultimately, "[t]he [duty] inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed [the plaintiff] a duty." *Malta*, 333 So. 3d at 395 (citing *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 292 (La 1993)).

"Louisiana courts elucidate specific duties of care based on consideration of 'various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Doe*, 339 So. 3d at 531 (quoting *Posecai*, 752 So. 2d at 766). Importantly, however, "[t]here is a universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Id.* (quotation and citation omitted).

"Under Louisiana law, one who does not owe a duty to act may assume such a duty by acting." *Hebert*, 974 So. 2d at 543 (citation omitted). So, "if a person undertakes a task which he has no duty to perform, he must perform that task in a reasonable and prudent manner." *Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 195 (5th Cir.

2019) (quoting *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 221 (La. Ct. App. 1st

Cir. 1992) (internal quotation marks omitted)). For its part, the Supreme Court of

Louisiana has "adopted" Section 324A of the Restatement (Second) of Torts to decide

if a defendant has assumed a duty. *Pickard*, 387 So. 3d at 524 (first citing *Hebert*, 974

So. 2d at 643–44; then citing *Bujol v. Entergy Servs., Inc.*, 03-0492 (La. 5/25/04), 922

So. 2d 1113, 1128, *adhered to on reh'g* (11/19/06)). Section 324A provides as follows:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of a third person or his things, is subject to liability to the
> third person for physical harm resulting from his failure to exercise
> reasonable care to protect his undertaking, if
>
> (a)    his failure to exercise reasonable care increases the risk of such
>        harm, or
>
> (b)    he has undertaken to perform a duty owed by the other to the
>        third person, or
>
> (c)    the harm is suffered because of reliance of the other or the third
>        person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A.

Relying on the Restatement, the Supreme Court of Louisiana has explained

that a "defendant assumes a duty under Section 324A when undertaking the

rendition of services to another, which the defendant should recognize as necessary

for the protection of a third person." *Pickard*, 387 So. 3d at at 524–24 (citing *Bujol*,

922 So. 2d at 1129). "An affirmative or positive undertaking is required, and courts

should consider [1] the scope of the defendant's involvement, [2] the extent of [the]

defendant's authority, and [3] [the] defendant's underlying intent." *Id.* at 525 (citing

*Bujol*, 922 So. 2d at 1131). "[T]he burden is on the plaintiff to prove by a

preponderance of the evidence facts sufficient to establish the action undertaken by the defendant." *Hebert*, 974 So. 2d at 644 (citing *Bujol*, 922 So. 2d at 1130).

At the outset, GAF contends that Luling's negligence claim fails as a matter of law because the Louisiana Products Liability Act ("LPLA") is Luling's exclusive remedy against GAF, GAF does not assert any LPLA claims, and the exception to LPLA exclusivity does not apply.[67] The Court disagrees. The LPLA "establishes the exclusive theories of liability for manufacturers for *damage caused by their products*." LA. STAT. ANN. § 9:2800.52 (emphasis added). Luling does not aim to hold GAF liable for damage caused by the roof itself; Luling aims to hold GAF liable for damage caused by GAF field-services representative Bobby Whitman's alleged negligent post-installation inspection of the roof. Because Luling does not aim to hold GAF liable for damage caused by the roof itself, the LPLA's exclusive-remedy provision does not bar Luling's negligence claim. *Cf. Duplantis v. Miller*, 2014-1070, p. 6 (La. App. 3 Cir. 3/4/15); 159 So. 3d 1153, 1157 ( "[T]he LPLA does not eliminate other causes of action against the manufacturer arising directly from its actions[.]" (citations omitted)).[68]

Next, GAF contends that Luling has not pointed to summary-judgment evidence sufficient to show that GAF affirmatively undertook a tort duty to conduct a reasonable post-installation inspection of the nursing home's roof for Luling's benefit. The Court agrees. Viewing the facts and drawing all reasonable inferences in

---

[67] ECF No. 145-1 at 10–11.

[68] *Accord, e.g., Craft v. Max Access, LLC*, No. 6:22-CV-05899, 2023 WL 8939436, at *5 (W.D. La. Dec. 12, 2023) (reasoning that the LPLA's exclusive-remedy provision did not bar claim for damages caused by the negligent acts of the manufacturer's employees), *report and recommendation adopted*, No. 6:22-CV-05899, 2023 WL 8936740 (W.D. La. Dec. 27, 2023).

Luling's favor, *see Reeves*, 530 U.S. at 150, and considering (1) the scope of GAF's involvement, (2) the extent of GAF's authority, and (3) GAF's underlying intent, *see Pickard*, 387 So. 3d at 525, the Court holds that Luling has not pointed to summary-judgment evidence allowing the Court to conclude that GAF affirmatively undertook a tort duty to conduct a reasonable post-installation inspection of the roof, for Luling's benefit and beyond the mere surface inspection the Guarantee contemplates.

***Scope of GAF's Involvement.*** The summary-judgment record, viewed in Luling's favor, reflects that GAF's relevant involvement in the installation and inspection of the roof was quite limited. Whitman's post-installation inspection of the roof was for the limited purpose of determining whether GAF would issue the Guarantee.[69] The Guarantee in turn explains that "[a]ny inspections made by GAF are limited to a surface inspection only" and "are for GAF's sole benefit."[70] As for the roof installation itself, GAF had virtually no involvement: Luling had no contractual relationship with GAF relating to installing the roof;[71] no one from GAF ever made any representations to Luling's principal, Clint Guillot, about anything related to the roof;[72] no one from GAF helped One Source Roofing install the roof;[73] and none of the roofing contractors relied on GAF to instruct them how to install the roof.[74] GAF's minimal involvement in the roof's installation and surface inspection coheres with industry custom: Roofing manufacturers like GAF do not typically perform any

---

[69] ECF No. 149-6 at 15:13–15.
[70] ECF No. 145-11 at 2.
[71] ECF No. 145-7 at 1–3
[72] ECF No. 145-3 at 80:16–20.
[73] ECF No. 145-4 at 14:3–4.
[74] *Id.* at 14:9–15.

physical or mechanical work on the buildings on which their products are installed; they merely make visual observations of roofing systems for their own benefit.[75]

***Extent of GAF's Authority.*** The summary-judgment record, viewed in Luling's favor, does not reflect that GAF had relevant authority with respect to installing the roof, and the record reflects that GAF had only limited authority with respect to a post-installation surface inspection of it. As for the installation, GAF did not control the installation or instruct One Source Roofing how to install the roof.[76] GAF in fact had no control over whether One Source Roofing followed good roofing practices.[77] As for the post-installation surface inspection, GAF's only potentially relevant authority was its power to refuse to issue the Guarantee to One Source Roofing.[78] Importantly, however, the record reflects that GAF could not have compelled One Source Roofing to correct the alleged errors that led the roof to fail.[79]

***GAF's Underlying Intent.*** The summary judgment record, viewed in Luling's favor, reflects that GAF did not intend to affirmatively undertake a duty to conduct a reasonable post-installation inspection of the roof for Luling's benefit and beyond the mere surface inspection the Guarantee contemplates. The best summary-judgment evidence of GAF's intent is the Guarantee itself, which makes plain that "[a]ny inspections made by GAF are limited to a surface inspection only" and "are for GAF's sole benefit."[80] Industry custom also indicates that GAF's underlying intent

---

[75] ECF No. 145-13 at 15:3–12.
[76] *Id*. at 14:9–15.
[77] ECF No. 151-3 at 17:12.
[78] ECF No. 145-9 at 12:9–17.
[79] ECF No. 145-4 at 14:5–8; ECF No. 151-3 at 17:10–12.
[80] ECF No. 145-11 at 2.

was not to undertake any duty to inspect the nursing home's roof for Luling's benefit. According to GAF's engineering expert, Karl Schaack, "[t]ypical inspections performed by roofing material manufacturer representatives on newly installed roofs are done so for their own purposes for determination for issuance of a guarantee."[81]

For its part, Luling counters that the Court may not rely on the Guarantee to narrow or eliminate GAF's duty.[82] Luling notes that it did not sign the Guarantee; it did not receive the Guarantee until after the roof failed; and GAF ultimately rescinded the Guarantee.[83] Luling thus contends that the Guarantee "cannot reflect the intent of the parties and bind Luling to its detriment."[84] But the Court is *not* considering the Guarantee for the purpose of enforcing a contractual limitation of liability against Luling, as Luling's argument presupposes;[85] the Court is considering the Guarantee for a distinct purpose—to help the Court determine the nature and scope of the "affirmative or positive undertaking" by GAF, as well as GAF's "underlying intent," in connection with Whitman's post-installation surface inspection of the nursing home's roof. *Pickard*, 387 So. 3d at 525 (citing *Bujol*, 922 So. 2d at 1131). The "action undertaken by" GAF and GAF's "underlying intent" in turn inform the Court's analysis of the question whether GAF affirmatively undertook an inspection-related duty for Luling's benefit under Section 324A of the Restatement

---

[81] ECF No. 145-16 at 7.

[82] ECF No. 149 at 21–22.

[83] *Id.*

[84] *Id.* at 22.

[85] For this reason, Luling's contractual-limitation-of-liability cases do not persuade the Court that the Guarantee is irrelevant to the duty analysis. *See id.* at 22 n. 93 (citing *Boston Old Colony Ins. Co. v. K&S Diesel Serv., Inc.*, No. 03-CV-3065, 2005 WL 840483, at *6 (E.D. La. Apr. 8, 2005); *Wilson v. Two SD, LLC*, 2015-0959 (La. App. 1 Cir. 12/23/15); 186 So. 3d 103, 109)); *id.* at n. 95 (citing *Dixie Roofing Co. of Pineville v. Allen Par. Sch. Bd.*, 1995-1526 (La. App. 3 Cir. 5/8/96); 690 So. 2d 49, 53).

(Second) of Torts. *See id.* (citing *Bujol*, 922 So. 2d at 1131). In all events, Luling has not cited, and the Court has not found, Louisiana authority that convinces the Court that the Guarantee is irrelevant to, or may not be considered in connection with, a determination of the nature and scope of GAF's affirmative undertaking in the Section 324A assumption-of-duty analysis the Supreme Court of Louisiana requires.

In sum, considering (1) the scope of GAF's involvement, (2) the extent of GAF's authority, and (3) GAF's underlying intent, *see Pickard*, 387 So. 3d at 525, on this record, the Court holds that Luling has not carried its burden as non-movant to point to summary-judgment evidence from which the Court could conclude that GAF—a manufacturer that did not supervise or otherwise exercise meaningful control over One Source Roofing's installation of the nursing home's roof—affirmatively undertook a duty to conduct a reasonable post-installation inspection of the roof, for Luling's benefit and beyond the surface inspection contemplated by the Guarantee.

Cases confirm that affirmative-undertaking analysis. As noted, the Court has not found, and the parties have not cited, any opinion from any court applying Louisiana law that supports imposing a duty on a roof manufacturer to reasonably inspect a contractor's installation of the manufacturer's products for the building owner's benefit. On the contrary, the cases the parties cite weigh against imposing that duty here.

21

*Duplantis*—a fixture of Judge Milazzo's second motion-to-dismiss ruling[86]—disfavors imposing an all-purpose post-installation inspection duty on GAF. 159 So. 3d at 1154–58. There, homeowners sued the manufacturer of their roof and the contractor who installed the roof after construction defects prevented them from moving into their home. *Id.* at 1154. The homeowners alleged the manufacturer was liable for negligence because it failed to "offer guidance or assistance" to the contractor as to the installation of its product, and that the manufacturer's failure to offer that guidance contributed to the contractor's failure to install the roof properly. *Id.* at 1155. The homeowners based their assumption-of-duty argument on this language from the manufacturer's website: "You can depend on [the manufacturer] to provide assistance with the installation of your metal roof. By choosing [the manufacturer] as your single source supplier, you get skilled professionals to measure your roof and we will refer a trained independent contractor for the installation." *Id.* The homeowners said that language "caused them to believe that [the manufacturer] would provide supervision of the installation of the roof itself." *Id.* at 1158.

Unpersuaded, the Louisiana Third Circuit affirmed summary judgment dismissing the homeowners' negligence claims. *See id.* at 1158. The panel reasoned that the language of the website did not establish that the manufacturer assumed supervisory authority over the roof installation; that neither the homeowners nor the contractor sought assistance from the manufacturer in the installation of the roof;

---

[86] ECF No. 34 at 5–6.

and that the language of the website did not support the homeowners' argument that the manufacturer would remain on site and supervise the installation. *See id.*

What was true of the manufacturer in *Duplantis* is also true of GAF here. Like the manufacturer in *Duplantis*, (1) GAF did not assume supervisory authority over installation of the roof; (2) no contractor sought GAF's help in installing the roof; and (3) GAF did not owe a contractual obligation to the building owner, Luling, relating to the installation of the roof or a post-installation inspection of it. So *Duplantis* disfavors the inspection duty Luling asks the Court to impose on GAF here.

The cases on which Luling principally relies do not change the Court's analysis or the result. The first of those cases—*Cenac v. Orkin, LLC*—does not persuade the Court to reach a different result on the duty question. 941 F.3d 182 (5th Cir. 2019). There, homeowners sued a pest-control company, alleging that the company negligently recommended and directed them to install a vapor barrier in their home, and that the vapor barrier in turn caused the home to become infested by termites. *Id.* at 187–89. Reversing a summary judgment dismissing the homeowners' negligence claim against the pest-control company, a Fifth Circuit panel held that the pest-control company affirmatively assumed a tort duty to reasonably and prudently recommend and direct installation of a vapor barrier. *Id.* at 197. The panel based that assumption-of-duty holding chiefly on one homeowner's testimony that a representative of the pest-control company told the homeowner that the homeowner "[n]eeded to attach [the moisture barrier] to the undersurface of the home." *Id.* at 197. Because the pest-control company affirmatively "undertook the task of

recommending and directing installation of a vapor barrier," the panel reasoned, the pest-control company "was required under Louisiana law to perform that task in a reasonable and prudent manner." *Id.* (internal citation and quotation marks omitted).

*Cenac* does not control the assumption-of-duty analysis here for at least two reasons. First, unlike the pest-control company that specifically "recommend[ed] and direct[ed]" the homeowners to install a vapor barrier, *id.*, this summary-judgment record, viewed in Luling's favor, confirms that GAF did not communicate anything to Luling about Whitman's post-installation surface inspection of the roof. And second, unlike the record in *Cenac*, the record here reflects that GAF did not "direct[ ]" Luling to install anything related to the roof. *Id.* On the contrary, as noted, Luling had no contractual relationship with GAF relating to installing the roof;[87] no one from GAF ever made any representations to Luling's principal, Clint Guillot, about anything related to the roof;[88] no one from GAF helped One Source Roofing install the roof;[89] and none of the roofing contractors relied on GAF to tell them how to install the roof.[90]

Nor does *Crane v. Exxon Corp., USA*, compel the Court to conclude that GAF owes the inspection duty Luling proposes. 613 So. 2d 214 (La. Ct. App. 1st Cir. 1992). *Crane* held that the owner of a chemical plant voluntarily assumed a duty to monitor a jobsite for violations of the plant's safety standards by the construction company that employed the worker–plaintiff who was injured at the plant. *Id.* at 221. That holding rested principally on four facts: (1) the plant owner "maintained the right to

---

[87] ECF No. 145-7 at 1–3
[88] ECF No. 145-3 at 80:16–20.
[89] ECF No. 145-4 at 14:3–4.
[90] *Id.* at 14:9–15.

inspect the job at any time to monitor compliance with its specifications"; (2) the plant owner in fact "exercised this right by providing a field contract coordinator" who "spent an hour at the jobsite each day monitoring the progress of the job"; (3) the job of the "field contract coordinator" "was to make sure [the plaintiff's employer] was following [the plant owner's] rules or"; and (4) the "field contract coordinator" "personally reprimanded" plaintiff's employer "for safety violations on the job." *Id.*

*Crane* does not dictate a different result here because the summary-judgment record reflects that GAF did not exercise a degree of supervision and control over the installation of the roof that is comparable to the degree of supervision and control that the *Crane* plant owner exercised over the jobsite. As noted, this summary-judgment record, viewed in Luling's favor, reflects that GAF did not supervise One Source Roofing or otherwise exercise meaningful control over One Source Roofing's actual installation of the roof. Whereas the *Crane* plant owner exercised considerable supervision and control over the jobsite by sending a "field contract coordinator" to "monitor[ ] the progress of the job" on a daily basis, *id.*, GAF sent one field-services representative (Whitman) to the property just one time before the incident, for the limited purpose of conducting a surface inspection of the roof for GAF's sole benefit.

*Malta* also does not change the Court's duty analysis. 333 So. 3d at 389–410. There, the Supreme Court of Louisiana held that a company hired to inspect an oil-production platform's fire-suppression systems owed the plaintiff—a worker injured when a fire-suppressant cylinder discharged—duties to competently perform a safety inspection and to accurately report the results of the inspection. *Id.* at 395–96. This

25

case differs materially from *Malta* for at least three reasons: (1) unlike the inspection company in *Malta*, GAF is not a professional inspector and was not hired for the purpose of inspecting the roof; (2) unlike the inspection company in *Malta*, which was required to report its findings to the owner of the platform, GAF did not have any contractual obligation to report its post-installation surface inspection findings to Luling; GAF in fact had no contractual obligation with Luling until the Guarantee issued; and (3) unlike the inspection in *Malta*, which was intended "to protect the rig and the employees working thereon in the event of a fire," *id.* at 396, GAF's inspection was a surface (*i.e.*, visual) inspection undertaken for GAF's sole benefit.

Luling's fourth and final case—*Olympic Products v. Roof Systems, Inc.*—is the closest factual fit, but it does not change the Court's analysis or the result on the duty question. 363 S.E.2d 367 (N.C. Ct. App. 1988). There, a building owner sued a roofing manufacturer and a roofing contractor for negligence after a portion of the building's roof collapsed. *Id.* at 369–71. The building owner's expert traced the collapse to undersized holes cut in the roof membrane at certain drain openings. *Id.* at 370–71. That expert opined that the drain openings "did not meet the standard of care and workmanship of roofing contractors," and that "approval of the drain openings by the roofing inspector from [the manufacturer] did not meet the standard of care for roofing inspectors." *Id.* The building owner had no contract with the roof manufacturer. *Id.* at 371. But a contract between the roof manufacturer and the contractor required the contractor to "follow and adhere to all current, future and revised [manufacturer] specifications, installation instructions and procedures as

submitted from [the manufacturer] from time to time." *Id.* at 372 (internal quotation marks and alterations omitted). That contract also required the contractor to allow the manufacturer "to inspect the premises and approve installation of the [r]oofing [s]ystem and direct [the contractor] to make such changes at [the contractor's] own expense as [the manufacturer] deems necessary for proper installation." *Id.* (internal quotation marks omitted). For its negligence claim against the roof manufacturer, the building owner theorized that the roof manufacturer was liable for negligence because the manufacturer affirmatively assumed—and breached—a duty to inspect the contractor's installation of the roof's membrane. *Id.* at 371. The trial court disagreed and granted a directed verdict dismissing that negligence claim. *Id.* at 373.

The North Carolina Court of Appeals reversed. *Id.* That court held that the evidence, viewed in the light most favorable to the building owner, showed that the roofing manufacturer breached a duty to the building owner to inspect the roof and report to the building owner any variance from the manufacturer's specifications. *Id.* In so holding, the court emphasized (1) the terms of the contract between the roofing manufacturer and the roofing contractor; (2) that the manufacturer knew or should have known that compliance with its specifications "was necessary for [the building owner's] protection"; (3) that "the drain openings did not comply with [the manufacturer's] specifications"; and (4) that the manufacturer's "inspector approved these drain openings" even though they "met neither the general standard of care of roofing contractors nor complied with the [b]uilding [c]ode." *Id.* at 372–73.

27

*Olympic Products* does not compel a contrary conclusion under Louisiana law on this record. The Court's aim in this diversity case is to resolve the assumption-of-duty question as the Court thinks the Supreme Court of Louisiana would. *See S. K. A. V., L.L.C. v. Indep. Specialty Ins. Co.*, 103 F.4th 1121, 1123 (5th Cir. 2024) (internal citations omitted). That means the Court's "task is to attempt to predict" Louisiana law—"not to create or modify it." *Mary v. QEP Energy Co.*, 24 F.4th 411, 416 (5th Cir. 2022) (internal citation omitted). There is no indication that the Supreme Court of Louisiana would resolve the assumption-of-duty question under Louisiana law in the same manner as the North Carolina Court of Appeals applying North Carolina law. As just one example, the Supreme Court of Louisiana applies Section 324A of the Restatement (Second) of Torts to decide if a defendant has assumed a tort duty. *See Pickard*, 387 So. 3d at 524. But *Olympic Products* did not analyze the duty question under Section 324A, and it is unclear whether the result would be the same if it had.

There are also important factual differences between the record in *Olympic Products* and the record here. One of them is the absence of a contract between One Source Roofing and GAF that mirrors in material respects the contract between the manufacturer and the contractor in *Olympic Products*. That contract required the contractor to (1) "follow and adhere to all current, future and revised [manufacturer] specifications, installation instructions and procedures as submitted from [the manufacturer] from time to time"; and (2) allow the manufacturer "to inspect the premises and approve installation of the [r]oofing [s]ystem and direct [the contractor] to make such changes at [the contractor's] own expense as [the manufacturer] deems

necessary for proper installation." *Id.* (internal quotation marks omitted). There is no contract in this record, viewed in Luling's favor, that would allow the Court to conclude that GAF exercised a comparable degree of control and supervision over One Source Roofing's installation of the roof. True, per the scope-of-work for the job, One Source Roofing represented that "[u]pon completion of the job, the manufacturer's representative" would "inspect and certify the new roof system and [would] then present" the Guarantee to Luling.[91] But the Guarantee confirms that "[a]ny inspections made by GAF are limited to a surface inspection only" and "are for GAF's sole benefit."[92] So the scope-of-work does not support a conclusion that GAF exercised the same degree of control and supervision over installation of the roof as did the manufacturer in *Olympic Products*.

**B.    Breach**

The Court has held that the summary-judgment record, viewed in Luling's favor, does not allow the Court to conclude that GAF owed Luling a duty to conduct a reasonable post-installation inspection of the roof for Luling's benefit and beyond the surface inspection the Guarantee calls for. But even if the Court assumes GAF affirmatively undertook some other, lesser inspection-related duty—*e.g.*, a duty to conduct a surface inspection of the already-installed roof—there is no genuine dispute that GAF did not breach that duty in a manner that caused Luling's alleged damages.

---

[91] ECF No. 145-7 at 3 (boldface deleted).
[92] ECF No. 145-11 at 2.

Luling counters that breach is a fact question the Court may not resolve on summary judgment. That argument is half right. True, "whether a defendant has breached a duty owed is a question of fact" decided by the fact-finder—here, a jury. *Broussard v. State ex rel. Office of State Bldgs.*, 2012-1238, p. 12 (La. 4/5/13); 113 So. 3d 175, 185. But the Court still may grant summary judgment if a party fails to present evidence from which the fact-finder may reasonably infer breach of a duty. *See, e.g.*, *Goins v. Wal-Mart Stores, Inc.*, 2001-1136 (La. 11/28/01); 800 So. 2d 783, 788 (granting summary judgment after assuming *arguendo* the defendant owed a duty "because it is clear that the breach element cannot be proved"). Just so here.

Viewing the facts and drawing all reasonable inferences in Luling's favor, *see Reeves*, 530 U.S. at 150, and assuming—for argument's sake only—that GAF affirmatively undertook a duty to conduct a surface inspection of the roof for Luling's benefit, the Court holds that Luling has not pointed to evidence creating a genuine dispute as to whether GAF breached that hypothetical duty in a manner that caused Luling's claimed damages. The record, viewed in Luling's favor, reflects that the alleged issues that led the roof to fail could not have been observed during Whitman's surface inspection of the already-installed roof.[93] And even if Whitman could have observed those alleged issues, the record reflects that GAF could not have compelled One Source Roofing to fix them.[94] Accordingly, there is no genuine dispute that GAF

---

[93] Those alleged issues include that "[t]he roof deck did not have the proper pull out resistance (or 'bite') for fasteners; that "there were multiple layers of roofing on the structure"; that "the wood nailers were deteriorated or nonexistent"; and that "the roofing membrane was attached to an inadequate substrate." ECF No. 149 at 25. During his surface inspection, however, Whitman was "unable to determine what the substrate" was "fastened into," and he could not verify the thickness of the decking because it was covered when he arrived. ECF No. 145-5 at 11:8–14; *id.* at 11:15–24.

[94] ECF No. 145-4 at 14:5–8; ECF No. 151-3 at 17:10–12.

did not breach any lesser inspection-related duty it may hypothetically have assumed.

*     *     *

To sum up: The summary-judgment record, viewed in Luling's favor, does not allow the Court to conclude that GAF affirmatively undertook a duty to conduct a reasonable post-installation inspection of the nursing home's roof, for Luling's benefit and beyond the mere surface inspection the Guarantee calls for. And even if the Court assumes that the record supports a conclusion that GAF affirmatively undertook some lesser inspection-related duty—for example, a duty to conduct a visual inspection only of the already-installed roof—the summary-judgment record, viewed in Luling's favor, does not support a finding that GAF breached any such duty in a manner that caused Luling's alleged damages. Because the Court holds that this summary-judgment record reflects no genuine dispute that GAF did not affirmatively undertake any inspection-related duty to Luling that GAF breached, GAF is entitled to summary judgment dismissing Luling's Louisiana-law negligence claim.

## V.    CONCLUSION

Accordingly,

**IT   IS   ORDERED** that   GAF's   motion[95]   for   summary   judgment   is

**GRANTED.** Luling's claims against GAF are **DISMISSED** with prejudice.

New Orleans, Louisiana, this 10th day of January, 2025.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

___

[95] ECF No. 145.